UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ANGEL L. COTTO,

                             Plaintiff,                  DECISION AND ORDER

   -v-

                                                              12-CV-6106 CJS

ROCHESTER CITY SCHOOL DISTRICT,

                             Defendant.

_____

## APPEARANCES

For Plaintiff:                    Angel L. Cotto, *pro se*
                                   32 Roser Street
                                   Rochester, New York 14621

For Defendant:               Cara M. Briggs, Esq.
                                   Rochester City School District
                                   131 West Broad Street
                                   Rochester, New York 14614

## INTRODUCTION

This is an action alleging employment discrimination in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. Defendant terminated Plaintiff's employment after he tested positive for cocaine use, at a time when he was using cocaine on a weekly basis. Now before the Court is Defendant's motion for summary judgment (Docket No. [#15]). The application is granted.

## BACKGROUND

The following are the undisputed facts of this case, viewed in the light most-favorable to Plaintiff as the non-moving party. Plaintiff was formerly employed by the defendant school district as a stock handler. In that capacity, Plaintiff was a member of a labor union,

the Board of Education Non-teaching Employees, BENTE/AFSCME Local 2419, which had a collective bargaining agreement ("CBA") with the School District. During part of the time that he was employed by school district, Plaintiff was an elected officer of that union.

Plaintiff was aware that the School District had a "drug free workplace" rule, which prohibited him from using illegal drugs at work or at any time if the effects of the illegal drugs would impair the performance of his duties. In connection with that policy, the School District established an Employee Assistance Program ("EAP"), to "provide appropriate and confidential prevention, intervention, assessment, referral, support and follow-up services for district staff." Docket No. [#10] at p. 106.

On November 14, 2008, Plaintiff was working in a warehouse when his female supervisor, Myrna Matos ("Matos") directed him to turn off the radio to which he was listening. Plaintiff refused, and an argument ensued. *See*, Docket No. [#15-5], Pl. Dep. at 13. Matos reported the incident and indicated that she had been fearful that Plaintiff would assault her during their argument. Subsequently, Matos' supervisor, Gary Smith ("Smith"), sought to have Plaintiff suspended, and to have Plaintiff immediately tested for drug usage. On this point, the record suggests that the District's Human Resources office specifically requested that Plaintiff be tested, not based solely on the particular incident with Matos, but because Plaintiff also had a "history of being late and not calling in." *See*, Docket No. [#10] at p. 230. Plaintiff initially refused to take a drug test, but provided a urine sample later in the day. However, the testing laboratory indicated that the urine sample was "invalid," because it was too small. The School District deemed Plaintiff's submission of the invalid sample to be a violation of the drug policy, and suspended Plaintiff for two weeks, without pay. To avoid the suspension, though, Plaintiff and the union worked out a "Last Chance

Agreement" with the District, under which Plaintiff agreed to participate in the Employee Assistance Program ("EAP") and to submit to random drug testing for one year. Further, as part of that agreement, Plaintiff agreed that his employment could be terminated if he either tested positive for drug use or failed to comply with the testing procedures.

On September 28, 2009, Plaintiff was directed to report for drug testing at 2:30 p.m. However, Plaintiff failed to appear at that time, though he appeared later that day. Such failure was a violation of the Last Chance Agreement. *See*, Docket No. [#10] at p. 100.[1] The following day, the School District terminated Plaintiff's employment. As part of the aforementioned Last Chance Agreement, Plaintiff had agreed that if he violated the terms of the agreement, the termination of his employment would be "non-grievable" under the CBA. *See*, Docket No. [#10] at p. 100. Nevertheless, Plaintiff approached a member of the Rochester City School Board, Melisza Campos ("Campos"), and asked her to intervene for him, which she did. Thereafter, on September 28, 2009, the School District entered into a second "Last Chance Agreement" with Plaintiff, similar to the first one. Specifically, the second "Last Chance Agreement" required Plaintiff to participate in the EAP and to undergo drug testing. The agreement further indicated that Plaintiff's job performance would be closely monitored.

With regard to Plaintiff's participation in the EAP program, he executed release forms, allowing EAP to release certain information to the School District, about his attendance at EAP appointments, his willingness to participate in treatment and accept referrals, and

---

[1] Under the subject drug policy, procedural failures were deemed to constitute "positive" test results. *See, e.g.*, Docket No. [#10] at p. 142 ("Failure to comply with testing procedures and protocols constitutes positive drug test results.").

3

whether the EAP counselors were recommending that he receive treatment. *See*, Docket No. [#10] at pp. 126-127. However, there is no indication in the record that EAP ever provided such information to the District. Consequently, there is no indication that EAP told the District anything about the fact or extent of Plaintiff's drug usage, or whether Plaintiff had a drug addiction. In any event, there is no indication in the record that Plaintiff ever told his EAP counselor that he used drugs. Instead, Plaintiff indicates that he only told his EAP counselor that he used alcohol. *See*, Docket No. [#15-5], Pl. Dep. at p. 47. The EAP counselor subsequently released Plaintiff from the EAP program after Plaintiff tested negative.[2] (Docket No. [#15-5], Pl. Dep. at p. 47). Plaintiff never told his EAP counselor that he needed or wanted any "additional support." *Id*. Nor did Plaintiff ever tell anyone else at the school district that he needed additional support to deal with a drug habit. *Id*. at 47-48.

In or about September, 2010, the district directed Plaintiff to report for drug testing, pursuant to the Last Chance Agreement. However, Plaintiff asked his supervisor if he could go home to avoid the testing, because he knew that he would test positive for drug use. Specifically, Plaintiff told his supervisor, "I'm dirty. Come on man. I messed around. I made some mistakes and I'm dirty. Let me go home." (Docket No. [#15-5], Pl. Dep. at 36; see also, *id*. at 36-38). Plaintiff told his supervisor that he was "going through a lot of stuff" in his personal life. *Id*. at 37. Plaintiff further told his supervisor, "I made a mistake and I have done it [used drugs] a couple times." *Id*. at 38. The supervisor, Ernie Pavone ("Pavone"), allegedly acceded to Plaintiff's request, and told his supervisors that Plaintiff was not at work that day. Consequently, Plaintiff avoided taking the test that day.

---

[2]It is unclear whether the EAP counselor tested Plaintiff for alcohol, illegal drugs or both.

Thereafter, on October 12, 2010, Plaintiff was again directed to report for drug testing, at which time he gave a urine sample. However, the testing laboratory determined that the sample was diluted. Therefore, the School District required Plaintiff to appear again for testing, on October 20, 2010, at which time the laboratory collected both a urine sample and a hair sample. Plaintiff's hair sample tested positive for cocaine use. (Pl. Dep. at 37-38).

Plaintiff does not deny that the hair test result was accurate, since he was actively using cocaine at that time. Plaintiff states: "I was doing cocaine. So I was doing it maybe once a week, once every two weeks. I was going through a lot of stuff." (Pl. Dep. 39). More specifically, Plaintiff indicates that he was actively using cocaine, both before and after Defendant terminated his employment:

> Q. Was your use of cocaine something that was a once-in-a-while thing?
>
> A. Every freaking Friday – every Friday – every time when Friday came along.
>
> Q. Do you know how many years it was that you used cocaine?
>
> A. A few years. Eight, nine years.
>
> ***
>
> Q. When did you stop using cocaine?
>
> A. When I lost my job.
>
> Q. In 2010?
>
> A. (Nonverbal response.)
>
> Q. You lost your job in October of 2010?
>
> A. A few more times after that, but I have two kids and everything was going down hill. So....

5

> Q. Okay. So would it be fair to say that you were using cocaine from approximately 2002 through the end of 2010; does that sound right to you?
>
> A. What was that?
>
> Q. Would it be fair to say that you were using cocaine from 2002 to the end of 2010; does that sound about right to you?
>
> A. Yeah.

Pl. Dep. at p. 48-49

As a result of Plaintiff having tested positive for drug use, the School District terminated his employment. *See*, Docket No. [#10] at pp. 103-104 (Indicating that Plaintiff's employment was terminated "due to positive results of a drug test, which is in direct violation of [the parties'] last chance agreement[.]").

Plaintiff, though, believed that his dismissal was discriminatory, and on November 1, 2010, he filed a discrimination complaint with the New York State Division of Human Rights ("NYSDHR"), which was dual-filed with the U.S. Equal Employment Opportunity Commission ("EEOC"). The complaint alleged discrimination on the basis of national origin, race and sex, but not disability. Docket No. [#10] at p. 121. Plaintiff alleged that the discrimination consisted of "unfair testing" and the termination of his employment. *Id*. at 122. The complaint primarily described alleged discriminatory animus, based on Plaintiff's gender and race, directed at him by Matos, his female former supervisor. *Id*. at 123.

On December 27, 2010, Plaintiff filed an amended NYSDHR complaint, which added an allegation of discrimination based on "disability," which Plaintiff described as "perceived drug abuser." Docket No. [#10] at p. 136. In that regard, Plaintiff alleged that his mandatory participation in EAP showed that the School District "perceived [him] to be a drug abuser."

6

*Id*. at 138. Plaintiff also alleged that the aforementioned drug testing was improper, since it was performed without any "reasonable individualized suspicion" of drug usage. *Id*. at 138.

On October 3, 2011, the NYSDHR dismissed the complaint, finding that the School District did not discriminate against Plaintiff. *See*, Complaint [#1], attached NYSDHR Determination and Order After Investigation, Case No. 10144931. On November 28, 2011, the EEOC issued a right-to-sue letter, dismissing the complaint and adopting the NYSDHR's findings. *See*, Complaint [#1], attached EEOC right-to-sue letter.

On February 27, 2012, Plaintiff commenced the subject action, proceeding *pro se*, asserting a claim under the ADA. The Complaint (Docket No. [#1]) contains the following narrative paragraph:

> On September 28, 2009, I arrived late for a random drug test wich was given to CDL drivers. I was not a CDL driver. I was tested because Defendant perceived me to be 'confrontational.' I was placed on a last chance agreement. [illegible] I received counseling from defendant's Employee Assistance Program ('EAP'), which discharged me after a couple of visits. On October 12, 2010, I produced a dilute specimen. Defendant considered this a 'positive.' I retested on Oct. 20, 2010. Defendant took both urine and hair. I believe no other testee's hair was taken. The urine tested negative. Nonetheless, Defendant tested my hair and it was positive. There was no individualized reasonable suspicion.

Complaint [#1] at p. 4. In his motion for appointment of counsel, which the Court denied, Plaintiff reiterated that this action is based on "discriminatory drug testing resulting in termination of employment." *See*, Motion for Appointment of Counsel [#3].

The parties then conducted pre-trial discovery, during which Defendant deposed Plaintiff. At deposition, Plaintiff explained the basis for his ADA discrimination actions, in pertinent part, as follows:

7

Q. On February 27, 2012, or thereabouts, you filed a lawsuit against the District in Federal Court; correct?

A. Yes.

Q. The Western District?

A. Yes.

Q. And the actions that you complained about by the District are the termination of your employment and discriminatory drug testing and Last Chance Agreement. Can you describe how the drug testing and Last Chance Agreement were discriminatory?

A. I went for a drug test, a screening, and they said it was diluted. And the paper says retest and restrict fluids. When I go back, I gave them the sample. And they said, 'The District wants me to take a hair sample too.' I said, 'The paper says restrict fluids. So do you want me to sit here all day without drinking so you can take a sample?' He said, 'No. We can do that, but we are also doing a hair sample.' So that is not what the lab ordered, but ... [sic]

Q. Can you tell us how that is discriminatory?

A. I believe they asked for another specimen test then go do the hair sample or you have to have blood work. But when I went to the office that the district hires to do this drug screening, he said, 'No. The district wants you to do a hair sample.'

Q. So was it the hair sample that you found to be discriminatory, the hair sample request for testing?

A. The drug testing. Yes.

Q. What was discriminatory about the request for you to give a hair sample for testing?

A. I believe the District was looking – they were wanting to go deeper and find me dirty, find whatever possible test they could do to – for me to – they wanted to find out that I was dirty. So everybody – as far as – as long as I have been in the district, I don't remember anybody doing a hair sample from the district.

***

> Q. [On the form Complaint that you used, when asked,] are you incorrectly perceived as being disabled by your employer, . . . you checked yes. Can you explain that?
>
> A. I have – it's tough. I was doing – I believe I was – I was – I had a condition, a sickness. For a long time of years I believe it came around and the drug took my brain. I had a disability with that, with that drug.
>
> \*\*\*
>
> Q. So if I understand you correctly, you are not disabled from doing your work; correct?
>
> A. Yes.
>
> Q. But you had, in your opinion, a sickness that made you use cocaine; correct?
>
> A. Yes.
>
> Q. How do you feel that you were treated differently from anyone else who was tested for drug use?
>
> A. I just said that I don't remember anybody being – doing – giving a hair sample.

(Pl. Dep. at 51-56).

Following the completion of pre-trial discovery, on January 4, 2012, Defendant filed the subject motion for summary judgment, and served Plaintiff with the required *Irby* notice to *pro se* litigants. Defendant maintains that Plaintiff cannot establish a prima facie ADA claim, because he was actively using illegal drugs during his employment, and because he cannot produce any evidence of disability-based discriminatory animus. Defendant further maintains that it has proffered a legitimate non-discriminatory reason for terminating Plaintiff's employment, which Plaintiff has not shown to be pre-textual. Additionally, Defendant maintains that Plaintiff's claim is precluded by his earlier NYSDHR action, in which the agency dismissed his claims of discrimination.

9

On February 15, 2012, the Court issued a Motion Scheduling Order [#16], directing Plaintiff to file and serve any responsive papers by March 8, 2013. Plaintiff never filed responsive papers. On July 12, 2013, the Court heard oral argument. Following oral argument, the Court gave Plaintiff additional time to attempt to retain counsel, however he did not do so.

DISCUSSION

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). Moreover, since Plaintiff is proceeding *pro se*, the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

At the outset, the Court disagrees with Defendant's contention that Plaintiff is barred from asserting the subject claims based on his earlier administrative proceedings. In that regard, Defendant maintains that Plaintiff should be barred from re-litigating his discrimination claim in this Court, since the NYSDHR already dismissed his claims. However, such prior administrative ruling does not bar Plaintiff from bringing an ADA claim in this court based on the same facts where, as here, the NYSDHR's administrative

determination was apparently never reviewed by a state court. *See, Fogle v. Monroe County*, 831 F.Supp.2d 602, 607-608 (W.D.N.Y. 2011) (citing, *inter alia*, *Joseph v. Athanasopoulos*, 648 F.3d 58, 64 n. 6 (2d Cir. 2011), in which the Second Circuit stated that the U.S. Supreme Court's holding, in *University of Tennessee v. Elliot*, 478 U.S. 788 (1986), that unreviewed state administrative proceedings do not have preclusive effect in Title VII claims, also applies to ADA claims); *see also, Jones v. New York City Housing Auth.*, No. 94 Civ. 3364(DC), 1995 WL 736916 at *2 (S.D.N.Y. Dec. 13, 1995) ("[A] plaintiff who sues in federal court under the employment provisions of the ADA is not precluded from relitigating findings of a state administrative agency that have not been judicially reviewed."). Accordingly, Defendant is not entitled to summary judgment on that basis.

The Court will now consider the merits of Plaintiff's claim in light of the points that Defendant has raised. In that regard, although Plaintiff never responded to Defendant's motion, the Court is mindful of Plaintiff's *pro se* status, and has examined the entire record to determine the strongest arguments in Plaintiff's favor.

Plaintiff is suing under the ADA, and although the Complaint refers only to discrimination in connection with the hair-testing procedure and the termination of Plaintiff's employment, the record also indicates that Plaintiff believes Defendant failed to provide him with appropriate help to address his cocaine usage. With regard to those claims, the law is well settled:

> To establish a prima facie case for discriminatory discharge under the ADA, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he is a "qualified individual" with a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired because of his disability. *See, e.g., Brady* [*v. Wal-Mart Stores, Inc.*], 531 F.3d [127,] 134 [(2d Cir. 2008)] (*citing*

11

> *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir.2004)); *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149–50 (2d Cir. 1998).
>
> Moreover, to establish a prima facie reasonable accommodation claim, a plaintiff must show that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [his] disability; (3) with reasonable accommodations, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Monterroso v. Sullivan & Cromwell, LLP*, 591 F.Supp.2d 567, 577 (S.D.N.Y.2008) (*citing Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).

*Fahey v. City of New York*, No. 10 Civ. 4609(ILG)(MDG), 2012 WL 413990 at *5-6 (E.D.N.Y. Feb. 7, 2012).

Defendant maintains that Plaintiff cannot prove a discriminatory discharge claim, because he is not a "qualified individual with a disability," and because there is no evidence that he was fired because of a disability or perceived disability. The Court agrees. In the first place, Plaintiff cannot establish a *prima facie* case because he was not a qualified individual with a disability under the ADA, since he was actively using drugs at the time Defendant terminated his employment due to such drug use. *See*, 42 U.S.C.A. § 12114(a) (West 2013) ("For purposes of this subchapter, a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use."); *see also*, *Maresca v. City of New York*, No. 12–1739–cv, 2013 WL 1007683 at *2 (2d Cir. Mar. 15, 2013) ("[T]he ADA does not prohibit the dismissal of employees for the present use of illegal drugs. *See* 42 U.S.C. § 12114(a).").

Nor, for purposes of a *prima facie* case, is there evidence that Defendant fired Plaintiff because of his alleged disability, or because Defendant perceived Plaintiff as being

disabled. In that regard, courts in this Circuit have held that a history of drug addiction, as opposed to current active drug use, may be considered a disability under the ADA. *See, e.g., Solomon v. Pepsi-Cola Bottling Co. of New York, Inc.*, 2011 WL 1560931 at *2 (S.D.N.Y. Apr. 25, 2011) ("[D]rug addiction, like alcoholism, is recognized as a disease that can be disabling, but . . . current drug use disqualifies a person from protection under [the ADA].") (citations omitted). However, there is no indication in the record that Defendant perceived Plaintiff as having a history of drug addiction, for which it discriminated against him. In that regard, Plaintiff never told Defendant, or even his EAP counselor, that he had a drug addiction. At the very most, Plaintiff told his supervisor, on one occasion, that he did not want to take a drug test because he would fail, based on having used drugs "a couple times," due to personal troubles at the time. *See*, Docket No. [#15-5], Pl. Dep. at 38. There is absolutely no indication or suggestion that this supervisor ever reported Plaintiff's admission to anyone else, or that he had any involvement in the decision to terminate Plaintiff's employment. In short, there is no evidence that Defendant actually perceived Plaintiff as having a disability related to drug addiction.[3]

Even assuming that Plaintiff could demonstrate a prima facie case of discrimination, Defendant has proffered a legitimate non-discriminatory reason for terminating Plaintiff's employment, which is that he violated the Defendant's drug policy by testing positive for

---

[3]One might argue that Defendant must have suspected that Plaintiff had a drug problem, since it required Plaintiff to undergo periodic drug testing. However, such testing was designed to detect current drug use, which, as already discussed, is not protected under the ADA. Moreover, Plaintiff never had an actual positive test result until the last one, for which he was terminated.

13

cocaine use.[4]  *See, Maresca v. City of New York*, 2013 WL 1007683 at *1 ("Maresca admits both that he tested positive for use of cocaine, and that the FDNY has in place a "zero-tolerance" policy that imposes the penalty of termination for FDNY personnel who test positive for use of illegal substances. Maresca further concedes that the FDNY explicitly relied on its zero-tolerance policy when it terminated his employment.  Identification of this policy satisfies the defendants' burden to articulate some legitimate, nondiscriminatory reason for Maresca's discharge.") (citation and internal quotation marks omitted).  Plaintiff, though, has not carried his burden of showing that the proffered reason was a pretext for intentional discrimination on the basis of disability.

In that regard, liberally construing the record, and especially his deposition transcript, Plaintiff's theory may be that Defendant's proffered reason is pre-textual, because the real reason Defendant wanted to fire him was because of his past involvement with his labor union. *See*, Pl. Dep. at p. 50 (Plaintiff indicated that the School District and the Union "clashed a lot," and supervisors "hated him" because of his past union-related confrontations with them.).  Alternatively, Plaintiff seems to believe that he was fired, in part, because his former supervisor, Ms. Matos, disliked him because he was a male. *See*, Docket No. [#15-

---

[4]ADA discrimination claims are analyzed using the familiar *McDonnell Douglas* framework. *See, Fahey v. City of New York*, 2012 WL 413990 at *5 (E.D.N.Y. Feb. 7, 2012) : "The Court must analyze Fahey's ADA discrimination claims under the "burden-shifting" framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *See, e.g., McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir.2009). Under this framework, the plaintiff bears the initial burden of proving a prima facie case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. "The burden of establishing a prima facie case is not a heavy one. One might characterize it as minimal." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir.2000) (citation omitted). If the plaintiff is successful, the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *Reeves [v. Sanderson Plumbing Prods.]*, 530 U.S. [133,] 142–43 [(2000]. If the defendant is successful, the presumption of discrimination has been rebutted, and the burden then shifts back to the plaintiff to prove that those "legitimate" reasons were a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)."

5], Pl. Dep. at pp. 43-44.[5]  However, even assuming that Plaintiff's vague and conclusory statements on these points were sufficient to raise a triable issue of fact as to whether Defendant's proffered reason is true, they do not raise any inference that the real reason, or one of the real reasons, Defendant terminated his employment was discriminatory animus on the basis of a disability.  Accordingly, such theories are not helpful to Plaintiff's ADA claim.

Plaintiff nevertheless maintains that he was singled-out for discriminatory treatment, since Defendant required him to provide a hair sample for drug testing, while it did not require other employees to provide hair samples.  However, Defendant required Plaintiff to provide a hair sample only after he provided urine samples that were not acceptable for testing, for various reasons.  And, although Plaintiff contends that he suffered discrimination in this regard, he has not alleged or shown that he was treated differently than any non-disabled co-worker who repeatedly provided unacceptable urine samples.

Still, Plaintiff maintains that Defendant bears some blame for him losing his job, since it failed to provide him with appropriate "help" for his cocaine problem.  On this point, Plaintiff contends that the EAP program was deficient, and that his supervisor, Pavone, was negligent in covering-up Plaintiff's drug use when Plaintiff asked him to do so.  According to Plaintiff, Pavone "should have taken me out – helped me differently."  In this regard,

---

[5]As a factual matter, it does not appear that Matos had any involvement in the decision to terminate Plaintiff's employment.  In that regard, Plaintiff's argument with his then-supervisor Matos occurred in 2008, long before he was fired, and it seems clear that she was not still supervising Plaintiff at the time his employment ended. *See*, Pl. Dep. at pp. 9, 50-51  (Plaintiff had four different supervisors during the years of his employment, three of whom were male, and his supervisor at the time his employment ended in 2010 was Ernest Pavone ("Pavone"), a male).

Plaintiff seems to be suggesting that Defendant failed to accommodate his alleged disability. However, this argument lacks merit.

Of course, discrimination under the ADA "includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 412-413, 122 S.Ct. 1516, 1529 (2002) (citing 42 U.S.C. § 12112(b)(5)(A)). However, even assuming that Plaintiff was "an otherwise qualified individual with a disability" within the meaning of 42 U.S.C. § 12112(b)(5)(A), which seems doubtful in light of the foregoing discussion,[6] Defendant could not be expected to provide an accommodation where, as here, Plaintiff hid his alleged cocaine addiction and never requested an accommodation. In that regard, although "[g]enerally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed," an employer nevertheless "has a duty reasonably to accommodate an employee's disability if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (citations omitted). In the instant case, Plaintiff reportedly told Pavone only that he used drugs a "couple of times," and he begged Pavone to keep that information a secret from the school district, which Pavone apparently did. Plaintiff never told anyone else employed by Defendant, including his EAP counselor, about his drug use, nor did he request any

---

[6]Some courts have held that employers have no duty under the ADA to accommodate active drug users. *See, e.g., Nanos v. City of Stamford*, 609 F.Supp.2d 260, 265 (D.Conn. 2009) ("'[P]ursuant to 42 U.S.C. § 12114(c)(4), employers need not make any reasonable accommodations for employees who are illegal drug users and alcoholics .... in marked contrast to all other disabilities, where the ADA does require that the employer extend reasonable accommodations.") ( quoting *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1086 (10th Cir. 1997)). While that sounds eminently reasonable, the Court need not decide that issue to dispose of this claim.

assistance, even though he obviously could have obtained treatment through EAP if he had wanted to do so. Accordingly, Plaintiff cannot now fault Defendant for failing to provide him with an accommodation under the ADA.

For all of the foregoing reasons, Defendant is entitled to summary judgment on Plaintiff's ADA discrimination claim.

CONCLUSION

Defendants' motion for summary judgment [#15] is granted and this action is dismissed with prejudice. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure. The Clerk of the Court is directed to terminate this action.

SO ORDERED.

Dated: August 26, 2013
Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge